# EXHIBIT A

### IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
### IN AND FOR BROWARD COUNTY, FLORIDA

MARKETING PARTNER SERVICES L.L.C.                CASE NO.
and SITE IMPACT L.L.C.,

                                                 **COMPLEX BUSINESS DIVISION**

            Plaintiffs,

v.

KATHRYN SCIORTINO, an individual,
and DATASYS GROUP, INC.,

            Defendants.

_____/

### COMPLAINT

Plaintiffs Marketing Partner Services L.L.C. ("MPS") and Site Impact L.L.C. ("Site Impact") (collectively "Plaintiffs") file this Complaint and Application for Temporary Injunctive Relief against Defendants Kathryn Sciortino ("Sciortino") and Datasys Group, Inc. ("Datasys") (collectively "Defendants") and respectively states as follows:

### NATURE OF THE ACTION

1.       This is an action for breach of contract, tortious interference with a business relationship, trade secret misappropriation in violation of Florida's Uniform Trade Secrets Act (Fla. Stat. § 688.001 *et seq.*) and the Federal Trade Secret Act, and violations of Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.202 *et seq.*).

### PARTIES, JURISDICTION AND VENUE

2.       Plaintiff Marketing Partner Services L.L.C. is a Florida limited liability company with its principal place of business located in Coral Springs, Florida.

3.       Plaintiff Site Impact L.L.C. is a Florida limited liability company with its principal place of business located in Coral Springs, Florida.

4.      Defendant Datasys Group, Inc. is a Florida company with its principal place of business located in Boca Raton, Florida.

5.      Upon information and belief, Defendant Kathryn Sciortino is a natural person domiciled in Palm Beach County.

6.      Defendant Kathryn Sciortino is currently employed by Defendant Datasys Group, Inc., with its principal place of business located in Boca Raton, Florida.

7.      This Court has subject matter jurisdiction pursuant to § 26.012, Fla. Stat., as the amount in controversy exceeds $150,000 exclusive of attorney's fees.

8.      This Court has personal jurisdiction over Defendants pursuant to § 48.193, Fla. Stat.

9.      Venue is proper in this Circuit because Sciortino agreed in the contract that is at issue in this action that venue is proper in Broward County.

## GENERAL ALLEGATIONS

### MPS and Site Impact

10.     Brandon Rosen is the founder and owner of both MPS and Site Impact. Rosen previously founded and owned BMI Ventures Inc. d/b/a BMI Elite ("BMI"), a company that was eventually re-branded in or around 2017 as Site Impact.

11.     BMI''s rebranding to Site Impact did not affect its business, products, services, market, client base, leadership, or function.  In other words, the business remained the same in all but name.

12.     As part of the 2017 rebranding from BMI to Site Impact, Rosen also created MPS to act as the employer of record for individuals working for Site Impact.

13.     MPS is the employer of record for those who work for Site Impact and handles payroll and employee benefits.

14.     Site Impact is the outward facing brand for which MPS employees work.

### Site Impact's Niche Business

15.     Site Impact is the leading white-label, multichannel digital marketing platform serving media companies, digital agencies, and their local advertiser customers. Site Impact works with clients to provide marketing solutions to help them target their ideal audiences. Site Impact specializes in multi-channel direct marketing services and delivers measurable results for its clients.

16.     Site Impact's premier offering is its Email Enhanced product. This product is comprised of a blend of various types of media, which may include e-mails, banners, buttons, text-links, clicks, sponsored emails, display ads, pop-ups, pop-unders, and similar online media. Site Impact's unique Email Enhanced product provides clients with specialized tools to implement successful multi-channel marketing campaigns. This specialized product helps clients maximize user engagement through a mixture of digital and media services.

17.     Site Impact utilizes real-time bidding platforms to purchase contextual ads for its clients to target the specific users within the client's market. The Email Enhanced product allows clients to use sponsored email ads and guarantees inbox placement.

18.     Site Impact's clients consist primarily of local media companies, small and midsized advertising agencies, and advertising resellers. This allows Site Impact to work with clients' customers (i.e., local car dealerships, businesses, etc.) to reach a broader client base.

### Sciortino's Role and Agreement

19.     Sciortino has a long history working with Rosen for his digital marketing businesses.

20.     Sciortino began working for Rosen prior to the start of BMI until her abrupt resignation on July 22, 2024.

21.     Sciortino began her employment with BMI starting on or about on or about February 1, 2011, as a Business Development Manager. During her tenure with BMI, her responsibilities were to source, prospect, and close new accounts for BMI. Sciortino was also responsible for managing and growing the book of business.

22.     When BMI rebranded as Site Impact, Sciortino maintained the same position and job duties. Starting on October 1, 2017, Sciortino worked for Plaintiffs in the role of Business Development Manager. As Business Development Manager, Sciortino continued the same duties she had at BMI: sourcing, prospecting, and closing new accounts for Site Impact. Sciortino continued to manage and grow the same book of business.

23.     In or around June 2022, Sciortino accepted the new role of Key Account Manager. As Key Account Manager, Sciortino was responsible for client management, which included providing all services, maintaining client relationships, and communicating with clients regarding Site Impact's product offerings. Site Impact relies on its Key Account Managers to grow the company's book of business by maintaining and growing the current customer base.  Sciortino was responsible for maintaining consistent communication with Site Impact's clients to maximize the revenue from existing accounts. She was also responsible for onboarding new clients, training clients, setting up campaigns, and optimizing campaign results.

24.     Sciortino's offer letter explicitly states that the terms of her employment are explained in detail within the "Employment Agreement; the Non-Compete, Non-Solicitation, Confidentiality and Non-Disclosure Agreement, and the Employee Handbook." The offer letter explained that the job offer is contingent upon the execution of the offer letter, sales commission

agreement and schedule, employment agreement, and non-compete, non-solicitation, confidentiality, and non-disclosure agreement. Sciortino signed and dated the offer letter on October 13, 2017.

25.     Sciortino received, signed, and dated the aforementioned Non-Compete, Non-Solicitation, Confidentiality and Non-Disclosure Agreement (the "Agreement") on October 1, 2017. (Exhibit A).

26.     The Agreement specifically states that Site Impact is the "Intended Third-Party Beneficiary." (Exhibit A, ¶ 25). Sciortino agreed that "[a]ll rights and remedies are intended for the benefits of [Site Impact L.L.C.] and without any limitation on the Company's rights and remedies." (Exhibit A, ¶ 25).

27.     The Agreement contains a Non-Disclosure of Confidential Information provision in which Sciortino agreed that she shall not, "at any time during Employee's employment or for ten (10) years after termination of employment, directly or indirectly, communicate, divulge or disclose, for any purpose whatsoever, or use for Employee's own benefit, or the benefit of any third party, any Confidential Information." The Agreement defines "Confidential Information" as, *inter alia*, "confidential information of a special and unique nature and value relating to such matters as Company's proprietary information with respect to the operation of the Company, its business, or the conduct of its marketing, advertising, research, and other proprietary procedures, all information and lists relating to actual, past, present and/or potential candidates, clients, customers, and referral sources, including names, addresses, telephone numbers, e-mail addresses, or any other identifying information; all information and lists relating to vendors and suppliers; methods of operation, systems, procedures, manuals, and confidential reports; sales and marketing plans; service information; financial strategies; and any other proprietary and confidential

information disclosed to, known by, or developed by Employee as a direct or indirect consequence of or through Employee's employment with Company." (Exhibit A, ¶ 3).

28.     Pursuant to the Agreement between MPS and Sciortino, the parties anticipated that Sciortino would receive Confidential Information and Trade Secrets from Site Impact. All Confidential Information from Site Impact is protected under the Agreement as Sciortino acknowledged that she would use all information she received in the course of her employment only under confidential conditions. (Exhibit A, ¶ 3).

29.     The Agreement also contains a non-compete provision of limited duration that precludes Sciortino from performing certain activities for a competitor within a limited territory:

> **Covenant Against Competition**. Employee acknowledges that his/her services to be rendered are of a special and unusual character which have a unique value to Company and that, because the damages suffered from Employee's breach of this covenant against competition would not be readily susceptible of measurement in an action of law, there is no adequate remedy at law. The Parties agree that a violation of the provisions of this paragraph shall cause an immediate and irreparable injury to Company. In view of the unique value to Company of the services of Employee and because of the Confidential Information to be obtained by or disclosed to Employee in connection with her employment, and as a material inducement for Company to employe Employee and to pay employee compensation, Employee covenants and agrees that, during his employment and for a period of two (2) years after the termination or expiration of his employment for any reason (collectively, the "Restrictive Period"), Employee shall not, without first obtaining the Company's express written agreement, as self-employed or employee or independent contract of any professional association, corporation, or other entity, or as a shareholder or a member of any corporation or other entity, or as director, officer, principal, agent, owner, employer, advisor, consultant, or in any individual or representative capacity whatsoever, either for Employee's own benefit or for the benefit of any other person or entity, or otherwise engage directly or indirectly in competition with Company in the following counties in the State of Florida: Broward, Palm Beach and Miami-Dade. Additionally, such geographic area shall include the area having a radius of 50 (Fifty) miles around any office of Company established at the time or after the execution of this Agreement. The entire geographic area shall include the area having a radius of 50 (Fifty) miles around any office of Company established at the time or after execution of this Agreement. The entire geographic area described in this subparagraph is collectively defined as "Company's Market Area." The Restrictive Period shall be extended during any period Employee is in breach of this section.

(Exhibit A, ¶ 6).

30.     The Agreement also contains a Covenant not to Solicit or Divert Work from Current and/or Prospective Candidates, Clients, Referral Sources, or Customers ("Prohibited Parties") in which Sciortino agreed that:

> . . . during the employment period and during the Restrictive Period, Employee shall: (1) not solicit (directly or indirectly) work from or provide services to any Prohibited Parties other than for the benefit of the Company; (2) not solicit (directly or indirectly) any Prohibited Parties to cease doing business with Company; (3) not solicit (directly or indirectly) any Prohibited Parties to commence receiving services with a legal or natural person other than Company; (4) not enter (directly or indirectly) into any business or arrangement which as the effect of diminishing Company's business; (5) not solicit (directly or indirectly) from any Prohibited Parties to provide (directly or indirectly) services of a type or kind that the Employee knows or reasonably should know that Company has performed or would have the capability to perform, even if Company does not do the work in question on a regular basis; and (6) not solicit (directly or indirectly) any Prohibited Parties for any other business purposes that would disadvantage Company in any way.
>
> "Solicit," whether directly or indirectly, shall not be limited in its definition to mean only the initiation of contact. Rather, "solicit" shall include, but not be limited to, the initiation of contact by Employee . . ., as well as Employee's . . . acceptance of an invitation of contact from Prohibited Parties.
>
> It is the parties' intent that this covenant be construed as broadly as possible to protect and preserve Company's current and prospective candidate client, referral source, and/or customer relationships during the Restrictive Period. The parties agree that the Restrictive Period shall be extended by any length of time during which the Employee is in breach of the covenant.

(Exhibit A, ¶ 7).

31.     The Agreement also contains a Covenant of Duty of Loyalty in which Sciortino agreed not to "engage in any form of business activity representing competition with Company, or plan any post-employment competitive business activity." (Exhibit A, ¶ 9).

32.     Sciortino expressly agreed to return all Confidential Information and agreed that she "will not take from Company, for [her] own use or the use of any third party, any document,

paper, computer-generated media, or other property of the Company containing Confidential Information." (Exhibit A, ¶ 4).

33.     Finally, the Agreement requires that Sciortino disclose her obligations to any future employers: "Employee agrees that he shall disclose the obligations contained in this Agreement to any third party that offers to employ him or engage him as an independent contractor in anticipation that his employment by Company will cease, and to any third party that in fact does employ him or engage him as an independent contractor after his employment by Company ceases." (Exhibit A, ¶ 10).

34.     During the course of Sciortino's employment, Sciortino had access to a great deal of confidential and trade secret information from Site Impact. In both of her roles, Sciortino had access to highly confidential client information.  Sciortino had intimate knowledge of each client's target market, marketing strategies, and contact information to maximize their email marketing campaigns.

35.     At the time of her resignation, Sciortino was responsible for working with some of Site Impact's top-tier accounts on a daily basis and worked directly with client leadership and stakeholders, strategizing with the clients on their independent needs and working with clients on ways to grow their relationships with Site Impact. Site Impact assigned Sciortino to specific clients and was responsible for maintaining and growing those client accounts. She also solicited and serviced new clients using the tools and resources Site Impact provided to her.

36.     In addition to Email Enhanced, Sciortino also sold Site Impact's suite of other digital marketing solutions (i.e., Display, Facebook, and over-the-top ("OTT") media services).

37.     In her role, Sciortino had leadership resources at her disposal to assist with any client needs, including documents and case studies to provide her clients with the information they

needed. At the time of her resignation, Sciortino was managing the entire partnership between the business and stakeholders within Site Impact's clients' organizations.

38.    Site Impact also provided Sciortino with access to its Order Management System ("OMS"), which is Site Impact's proprietary customer relationship management software. Through OMS and other systems, Sciortino had regular access to customer lists and contact information, customer financial information, customer pricing, and back-end customer settings.

39.    Site Impact takes reasonable measures to protect its competitively sensitive and confidential information, including but not limited to client data, marketing and sales strategies, and pricing information. This includes requiring all employees, including Sciortino, to sign confidentiality agreements. Such agreements are intended to protect Site Impact's business, including the competitively sensitive and confidential information that gives Site Impact an advantage over its direct competitors, such as Datasys.

40.    In addition to using restrictive covenants, Site Impact employs several security and control measures. Site Impact utilizes a multi-level security structure to ensure the protection of its Confidential Information and Trade Secrets. This includes requiring password-level security for all employees, restricting access to files and information, using multi-factor authentication and firewalls, limiting logins from certain states and foreign countries, and investigating all security breaches and unauthorized file access.

41.    Additionally, specific client data and information are accessible by only those individuals who need to use such information in the course and scope of their job duties for Plaintiffs. Indeed, only the individuals assigned to a particular client and upper management have the ability to access that client's information.

42.     Site Impact also protects its OMS through the security measures above, as well as through passwords that must be regularly changed. The customer data within OMS is also protected, and certain access is permission-based. Nevertheless, Sciortino had full access during her employment to all of her client's data and contact information. Due to Sciortino's significant tenure with Site Impact and its predecessor, Sciortino has historical knowledge of clients that she gained throughout her 13 years with the company.

**Sciortino Breaches The Agreement and Unfairly Competes**

43.     On or about July 11 to July 19, 2024, Sciortino was out of the office on vacation, utilizing Paid Time Off ("PTO"), during which time she was completely relieved of her job duties.

44.     When she returned to work on July 22, 2024, at 9:00 a.m., she emailed notice of her immediate resignation to her manager and the Human Resources team. Despite working for Rosen's companies for 13 years, Sciortino did not provide any notice of her resignation.

45.     On July 23, 2024, the day after Sciortino's resignation, Plaintiffs learned that Sciortino had begun working for its direct competitor, Datasys.

46.     Datasys offers many of the same products and services as Site Impact and competes with Site Impact for the same client base.

47.     Datasys advertises itself as a "leading data, analytics and digital media solutions provide with several proprietary data sets, multiple marketing channels and a robust marketing cloud. [Datasys] can analyze, strategize, and execute virtually any customer acquisition or retention campaign."[1] One of Datasys' main product offerings, Email Plus, is substantially similar to Site Impact's Email Enhanced product. Further, there is significant overlap between Datasys

---

[1] Datasys, https://datasys.com/about-us (last visited July 31, 2024).

and Site Impact's product offerings, as both companies offer digital marketing solutions such as Display, Facebook, and OTT.

48.     Datasys' office is located in Boca Raton, Florida, within 50 miles of Site Impact and squarely within the geographic area prohibited by Sciortino's non-competition agreement.

49.     On information and belief, Sciortino is working for Datasys in the same or substantially similar capacity in which she worked for Plaintiffs.

50.     ''On information and belief, Sciortino has disclosed and/or used Site Impact's confidential trade secret information, including customer lists, pricing, and sales information, for the benefit of Datasys.

51.     On information and belief, Sciortino is unable to provide the same services for Datasys as she had provided for Plaintiffs without necessarily using the information to which Sciortino had access when working for Plaintiffs.

52.     After Sciortino's termination, Plaintiffs discovered that while Sciortino was on PTO the week prior to her resignation, she had improperly accessed and downloaded Site Impact's highly confidential trade secrets, including client activity and spending reports for at least eight clients. These trade secrets contain information regarding the products and services in which Site Impact's clients are interested, how often they have purchased products and services, the pricing of products and services for each client, and the financial value of that client account. This information is highly confidential and provides Site Impact with a competitive advantage over 'its competitors.

53.     Site Impact has spent considerable time, effort, and expense tracking and compiling such information, which is not publicly available

54.    In the hands of a competitor, such confidential information would provide a competitive advantage that would undermine Site Impact in the narrow market in which it operates.

55.    Also while Sciortino was on vacation, she accessed a contract management tool called Circleback. Sciortino's team does not use Circleback, her job duties did not require her to use Circleback, and there is no legitimate business reason for Sciortino to use Circleback. Sciortino did not receive permission to use Circleback or input Site Impact's information into this program.

56.    During the same time period, Sciortino engaged in additional suspicious activity including, but not limited to: (i) engaging in a pattern of downloading reports with client and order information from the Order Management System and saving said reports locally on her laptop and not within Site Impact's internal database; and (ii) renaming and deleting various operations on these downloaded files.

57.    After Sciortino's termination, Site Impact's customer support team received an email from a client that Sciortino had managed prior to her resignation, informing them that the client to inform them had received a soliciting email from Sciortino in which she also stated that she had moved to a different company.

58.    Upon information and belief, Sciortino has been actively soliciting Site Impact's clients in her new position at Datasys, in an effort to directly compete against Site Impact, in breach of the Agreement.

**Plaintiffs Demand Defendants Cease & Desist**

59.    Following the discovery of improper conduct by Defendants, Plaintiffs sent both Sciortino and Datasys an immediate cease and desist letter dated July 23, 2024.

60.     In the cease and desist letter to Sciortino, Plaintiffs reminded Sciortino of her contractual obligations to Plaintiffs and demanded that she cease any and all activity in violation of the Agreement.

61.     In the cease and desist letter to Datasys, Plaintiffs notified Datasys of Sciortino's ongoing post-employment obligations, including the obligation not to compete against Plaintiffs, solicit Site Impact's clients or employees, or disclose Plaintiff's confidential information. Plaintiffs attached a copy of the Agreement to this letter. Plaintiffs also provided Datasys with a copy of Plaintiffs' cease and desist letter to Sciortino.

62.     Counsel for Datasys contacted the undersigned counsel acknowledging receipt of the cease and desist letter. As such, Datasys is aware of Sciortino's duties and role for Plaintiffs, as well as the restrictive covenants in the Agreement.

63.     Datasys confirmed it hired Sciortino and that Sciortino was working in a sales capacity. As such, it is clear that Sciortino is working for a Competing Business and performing the same and/or similar activities at Datasys that she performed for Plaintiffs, in the restricted territory, in direct violation of the non-competition provisions of the Agreement.

64.     Despite this notification, Defendants continued their unlawful conduct even *after* their receipt of the cease and desist letters. Defendants have caused and will continue to cause continuing and irreparable injury, which monetary damages cannot cure. Injunctive relief is imperative to preserve the status quo pending litigation between the parties on the merits.

65.     Plaintiffs have retained the undersigned counsel to bring this suit and have agreed to pay them reasonable attorneys' fees and costs.

66.     All conditions precedent to bringing this action have occurred, been met, excused, or waived.

## COUNT I
## BREACH OF CONTRACT—NON-COMPETITION
## (Against Defendant Sciortino)

67.     Plaintiffs incorporate by reference paragraphs 1-63 of the Complaint as if the same were set forth in full herein.

68.     The Agreement is a valid and enforceable contract that is supported by adequate consideration.

69.     Sciortino executed the Agreement on October 1, 2017, in exchange for compensation and other benefits she received from Plaintiffs.

70.     Plaintiffs fully performed their obligations under the Agreement, or were otherwise excused from such performance by Sciortino's actions and material breaches.

71.     Sciortino materially breached the Agreement by working for Plaintiffs' direct competitor, Datasys, in violation of Paragraph 6 of the Agreement.

72.     The noncompete provision in the Agreement is reasonable in time, area, and line of business and reasonably necessary to protect Plaintiffs' legitimate business interests in their valuable confidential business and client information, trade secrets, substantial relationships with prospective and existing clients, specialized training, and customer goodwill.

73.     As a direct and proximate result of Sciortino's material breach of the Agreement, Plaintiffs have suffered damages and continue to suffer damages by virtue of Sciortino's ongoing wrongful conduct.

74.     Sciortino's material breach of the Agreement has caused, and will continue to cause, irreparable harm to Plaintiffs if not temporarily and permanently enjoined.

75.     The public interest will be served by enjoining Sciortino from continuing such conduct, and the entry of injunctive relief will not negatively impact the health, safety, or welfare of the public at large.

76.     Plaintiffs have no adequate remedy at law.

**COUNT II**
**BREACH OF CONTRACT—NON SOLICITATION**
**(Against Defendant Sciortino)**

77.     Plaintiffs incorporate by reference paragraphs 1-63 of the Complaint as if the same were set forth in full herein.

78.     The Agreement is a valid and enforceable contract that is supported by adequate consideration.

79.     Sciortino executed the Agreement on October 1, 2017, in exchange for compensation and other benefits she received from Plaintiffs.

80.     Plaintiffs fully performed their obligations under the Agreement, or were otherwise excused from such performance by Sciortino's actions and material breaches.

81.     Sciortino materially breached the Agreement by soliciting at last one or more clients with whom she worked directly during her employment and work for Plaintiffs in violation of the non-solicit provision of the Agreement.

82.     The non-solicit provision in the Agreement is reasonable in time, area, and line of business, and is reasonably necessary to protect Plaintiffs' legitimate business interests in their valuable confidential business and client information, trade secrets, substantial relationships with prospective and existing clients, specialized training, and customer goodwill.

83.     As a direct and proximate result of Sciortino's material breach of the Agreement, Plaintiffs have suffered damages and continue to suffer damages by virtue of Sciortino's ongoing wrongful conduct.

84.     Sciortino's material breach of the Agreement has caused, and will continue to cause, irreparable harm to Plaintiffs if not temporarily and permanently enjoined.

85.     The public interest will be served by enjoining Sciortino from continuing such conduct, and the entry of injunctive relief will not negatively impact the health, safety, or welfare of the public at large.

86.     Plaintiffs have no adequate remedy at law.

**COUNT III**
**BREACH OF CONTRACT—CONFIDENTIALITY**
**(Against Defendant Sciortino)**

87.     Plaintiffs incorporate by reference paragraphs 1-63 of the Complaint as if the same were set forth in full herein.

88.     The Agreement is a valid and enforceable contract that is supported by adequate consideration.

89.     Sciortino executed the Agreement on October 1, 2017, in exchange for compensation and other benefits she received from Plaintiffs.

90.     Plaintiffs fully performed their obligations under the Agreement, or were otherwise excused from such performance by Sciortino's actions and material breaches.

91.     Sciortino materially breached the Agreement by using and/or disclosing Plaintiffs' confidential information for the benefit of a third party in violation of the confidentiality provision in the Agreement.

92.     The confidentiality provision in the Agreement is reasonably necessary to protect Plaintiffs' legitimate business interests in their valuable confidential business and client information, trade secrets, substantial relationships with prospective and existing clients, specialized training, and customer goodwill.

93.     As a direct and proximate result of Sciortino's material breach of the Agreement, Plaintiffs have suffered damages and continue to suffer damages by virtue of Sciortino's ongoing wrongful conduct.

94.     Sciortino's material breach of the Agreement has caused, and will continue to cause, irreparable harm to Plaintiffs if not temporarily and permanently enjoined.

95.     The public interest will be served by enjoining Sciortino from continuing such conduct, and the entry of injunctive relief will not negatively impact the health, safety, or welfare of the public at large.

96.     Plaintiffs have no adequate remedy at law.

**COUNT IV**
**MISAPPROPRIATION AND MISUSE OF TRADE SECRETS IN VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT**
**(Against All Defendants)**

97.     Plaintiffs incorporate by reference paragraphs 1-63 of the Complaint as if the same were set forth in full herein.

98.     Site Impact's customer list, customer information, and sales data constitute protectable trade secrets pursuant to Fla. Stat. § 688.002 in that they derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

99.     Site Impact has spent significant time and money developing such Confidential Information and Trade Secrets.

100.     Site Impact has made reasonable effort under the circumstances to keep customer lists, customer information, and sales data confidential, including, but not limited to, requiring its employees to sign agreements with non-disclosure provisions, restricting access to confidential and trade secret information, controlling access with two-factor authentication, and requiring that employees use passwords in order to further restrict access to such information.

101.     Plaintiffs' Confidential Information and Trade Secrets could not be compiled or created by Site Impact's competitors, if at all, without a significant investment of time, effort, and money.

102.     The use and/or disclosure of Plaintiffs' Confidential Information and Trade Secrets would provide Plaintiffs' competitors with an unfair economic advantage.

103.     In the course of her employment with and work for Plaintiffs, Plaintiffs afforded Sciortino access to and use of Site Impact's Confidential Information and Trade Secrets.

104.     Sciortino had a duty to maintain the secrecy of Plaintiffs' Confidential Information and Trade Secrets.

105.     On information and belief, Sciortino misappropriated Plaintiffs' trade secrets by *inter alia* using them for the benefit of her new employer Datasys, and/or improperly disclosing Site Impact's client list, client information, and sales data to Datasys, while under a duty to maintain the secrecy of such information, and to refrain from using such information for the benefit of anyone other than Plaintiffs.

106.     Sciortino's aforementioned acts of misappropriation were accomplished through improper means and without the express or implied consent of Plaintiffs.

107.    Datasys obtained Plaintiffs' Confidential Information and Trade Secrets by unlawful and improper means.

108.    The disclosure and unauthorized use of Site Impact's Confidential Information and Trade Secrets undermines Site Impact's competitive position in the industry.

109.    On information and belief, Defendants have used, disclosed, or relied upon Site Impact's Confidential Information and Trade Secrets in order to harm Plaintiffs or to benefit Site Impact's competitor Datasys.

110.    Defendants' conduct is knowing, willful, intentional, and malicious, and taken with reckless disregard for the rights of Plaintiffs.

111.    As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm.

<u>**COUNT V**</u>
<u>**MISAPPROPRIATION AND MISUSE OF TRADE SECRETS IN VIOLATION OF THE**</u>
<u>**DEFEND TRADE SECRETS ACT 18 U.S.C. § 1839**</u>
<u>**(Against All Defendants)**</u>

112.    Plaintiffs incorporate by reference paragraphs 1-63 of the Complaint as if the same were set forth in full herein.

113.    Plaintiffs own valuable Confidential Information and Trade Secrets within the meaning of the Defend Trade Secrets Act 18 U.S.C. § 1839(4). Site Impact owns its proprietary OMS and all the data therein, which Sciortino accessed for non-work purposes while she was on leave from work using PTO.

114.    Sciortino improperly accessed and downloaded Site Impact's highly confidential trade secrets, including client activity and spending reports for Site Impact's clients. These trade secrets provide insight into the products and services Site Impact's clients are interested in, how often they have purchased those products and services, and how much money they have spent on

such products and services. These trade secrets are valuable to Site Impact and its competitors because they assist in making targeted sales to clients based on offerings they have already shown an interest in and based on how much money they've historically spent.

115.    Site Impact has spent considerable time, effort, and expense tracking and compiling such information, which is not publicly available. Additionally, Site Impact has spent significant effort protecting these trade secrets via its IT Department and security measures.

116.    The trade secrets misappropriated by Defendants have significant economic value and provide Site Impact a competitive advantage in its narrow market. Finally, the misappropriated trade secrets are related to products and services used in and intended for use in interstate commerce.

117.    Defendants willfully and maliciously misappropriated Site Impact's trade secrets and confidential information.

118.    As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm.

<u>**COUNT VI**</u>
<u>**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**</u>
<u>**(Against All Defendants)**</u>

119.    Plaintiffs incorporate by reference paragraphs 1-63 of the Complaint as if the same were set forth in full herein.

120.    Defendants developed and carried out a plan to solicit Site Impact's clients using Site Impact's Confidential Information and Trade Secrets improperly obtained by Sciortino during her employment with MPS and while working for Site Impact.

121.     Upon information and belief, Datasys induced Sciortino to directly compete with Site Impact and solicit Site Impact's clients, in violation of Sciortino's Agreement. (Exhibit A at ¶¶ 3, 6-7).

122.     Defendants' conduct as described herein is unfair and unconscionable.

123.     As a direct and proximate result of Defendants' unfair and unlawful conduct, Plaintiffs have suffered and will continue to suffer damages.

124.     Because Defendants' conduct was willful and intentional, Plaintiffs are entitled to punitive damages in an amount necessary to deter Defendants and others from such conduct in the future.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Datasys)**

125.     Plaintiffs incorporate by reference paragraphs 1-63 of the Complaint as if the same were set forth in full herein.

126.     The Agreement between Sciortino and MPS is a valid and binding contract.

127.     Site Impact is explicitly listed as a third-party beneficiary of the Agreement and all rights and remedies are explicitly intended for the benefit of Site Impact, without any limitation on MPS's rights and remedies.

128.     The Agreement between Sciortino and MPS contains restrictive covenants that prevent Sciortino from working for third-party beneficiary Site Impact's competitor, either directly or indirectly.

129.     Datasys is and was aware of Sciortino's restrictive covenant obligations, which precluded Sciortino from working for Datasys, a direct competitor of Site Impact, for 2 years following the termination of Sciortino's employment.

130.    Datasys was on notice of Sciortino's restrictive covenants in the Agreement no later than July 23, 2024, when the undersigned counsel sent a letter to Datasys informing Datasys of Sciortino's restrictive covenants and providing a copy of the Agreement, to which counsel for Datasys responded the morning of July 24, 2024.

131.    Counsel for Plaintiffs also informed Datasys that Sciortino had been soliciting Site Impact's clients in direct violation of the Agreement.

132.    Despite knowledge of Sciortino's restrictive covenant obligations in the Agreement, Datasys continues to employ Sciortino, thereby inducing Sciortino to breach her obligations under the Agreement, in order to cause her to perform the same and/or substantially similar roles to that which she performed for Site Impact.

133.    Sciortino breached the Agreement by, *inter alia*, accepting employment with Datasys to perform the same and/or substantially similar job that she performed for Site Impact.

134.    Datasys' actions were and are intentional and unjustified.

135.    As a result of Datasys' tortious interference with the Agreement, Plaintiffs have suffered damages in an amount to be determined at trial.

136.    Additionally, Datasys' tortious interference has caused and will continue to cause irreparable injury to Plaintiffs for which no adequate remedy exists at law.

## **PRAYER FOR RELIEF, INCLUDING INJUNCTIVE RELIEF**

**WHEREFORE,** Plaintiffs Marketing Partner Services, L.L.C. and Site Impact L.L.C. respectfully request this Court enter an order as follows:

a.      granting temporary and permanent injunctive relief against Sciortino, enjoining her from working for a competing business of MPS or Site Impact for a period of 2 years, including but not limited to Datasys and any of its affiliates, parent companies, or other related entities;

b.      granting temporary and permanent injunctive relief against Sciortino, enjoining her from soliciting MPS's or Site Impact's clients, customers, prospective clients, or prospective customers in accordance with the Agreement for a period of 2 years;

c.      granting temporary and permanent injunctive relief against Datasys from further violation of and interference with the Agreement, including but not limited to the restrictive covenants within;

d.      granting temporary and permanent injunctive relief against Sciortino from further violation of the Agreement and enjoining Sciortino from any use or disclosure of MPS's or Site Impact's confidential information and trade secrets;

e.      granting temporary and permanent injunctive relief restraining Sciortino from unfairly competing with MPS or Site Impact by violating the Agreement;

f.      granting temporary and permanent injunctive relief prohibiting Defendants from misappropriating, disclosing, relying upon, or making available to any person or entity any of Site Impact's or MPS's Confidential Information and Trade Secrets.

g.      for an award of damages against Defendants in an amount to be determined by the trier of fact, together with pre- and post-judgment interest thereon at the maximum legal rate;

h.      requiring Defendants to immediately return all Confidential Information and Trade Secrets belonging to MPS and/or Site Impact and verify by affidavit the return of all Confidential Information and Trade Secrets, as defined above;

i.      requiring Defendants to permit a third-party forensic vendor access to Sciortino's and Datary's' devices, electronic accounts, and systems to ensure that any and all of Site Impact's and/or MPS's Confidential Information and Trade Secrets are located and removed;

j.      for an award of punitive damages, liquidated damages, exemplary damages, and/or

penalties as provided for by applicable law;

k.      for an award of attorneys' fees and costs; and

l.      for any award of such other relief as the Court may deem just or appropriate.

Date: August 5, 2024                              Respectfully submitted,

By:    /s/ Arielle S. Eisenberg
Arielle S. Eisenberg, Esq.
Fla. Bar. No. 0111467
aeisenberg@cozen.com
COZEN O'CONNOR
Attorney for Defendant
200 South Biscayne Boulevard
Suite 3000
Miami, FL 33131
Telephone:    786.871.3953
Facsimile:    786.220.0472

*Counsel for Plaintiffs*

# EXHIBIT A

# MARKETING PARTNER
## ─── S E R V I C E S ───

### NON-COMPETE, NON-SOLICITATION, CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This Non-Compete, Non-Solicitation, Confidentiality and Non-Disclosure Agreement (the "Agreement") is made and entered into in Broward County, Florida this _1_ day of _October_ 2017, by and between **MARKETING PARTNER SERVICES L.L.C.** ("Company"), and _Kathryn Solarino_ ("Employee"), sometimes each referred to individually as a "Party," and collectively as the "Parties."

### RECITALS

**A.** Company is engaged in the business of providing digital marketing and postal marketing services (the "Business").

**B.** Company desires to employ Employee, and Employee desires to be employed by Company, in accordance with the terms and conditions contained in this Agreement.

**C.** Employee and Company agree and acknowledge that the Employee shall be given access to information that is sensitive and absolutely confidential in nature and represents an asset of the Company in the nature of trade secrets and goodwill, which if disclosed or revealed in any manner or form would result in immediate irreparable harm and injury to Company.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises and agreements contained herein, Company and the Employee hereby covenant and agree as follows:

**1.** **Employment.** Company hereby employs Employee, and Employee hereby accepts such employment upon the terms and conditions set forth in this Agreement.

**2.** **Employment Relationship.** Employee is an at-will employee pursuant to the laws of the State of Florida. This means Employee may quit at any time, for any reason or no reason, with or without notice, and Company may terminate the Employee at any time, for any reason or no reason, with or without notice. There is no promise by Company that employment will continue for any set period of time. There is no promise by either Employee or Company that employment will be terminated only under particular circumstances. In particular, this policy of at-will employment shall not be modified by any statements, express or implied, contained in any employment handbook, application, memoranda, policy, procedure, or other materials or statements provided to Employee in connection with Employee's employment.

**3.** **Non-Disclosure of Confidential Information.** Employee acknowledges that as a result of Employee being retained by Company, Employee may make use of and acquire information received from third parties under confidential conditions; information subject to the Company's attorney client or work product privilege; and confidential information of a special and unique nature and value relating to such matters as Company's proprietary information and trade secrets, including, but not limited to, unpublished ideas, compilations or information with respect to the operation of the Company, its business, or the conduct of its marketing, advertising, research, and other proprietary procedures; all information and lists relating to actual, past, present and/or

potential candidates, clients, customers, and referral sources, including names, addresses, telephone numbers, e-mail addresses, or any other identifying information; all information and lists relating to vendors and suppliers; methods of operation, systems, procedures, manuals, and confidential reports; sales and marketing plans; service information; financial statements and records; computer software, programs, systems and strategies; and any other proprietary and confidential information disclosed to, known by, or developed by Employee as a direct or indirect consequence of or through Employee's employment with Company ("Confidential Information").

Employee acknowledges that all Confidential Information disclosed to Employee by Company is the exclusive property of Company, is material and confidential, and greatly affects the goodwill and the effective and successful conduct of Company's business. Accordingly, Employee covenants and agrees that Employee shall not, at any time during Employee's employment or for ten (10) years after termination of employment, directly or indirectly, communicate, divulge or disclose, for any purpose whatsoever, or use for Employee's own benefit or the benefit of any third party, any Confidential Information.

In the event that Employee is required by judicial or administrative process to disclose Confidential Information, Employee agrees to immediately notify the Company, in writing, of said requirement, affording the Company time and a meaningful opportunity to oppose such process.

**4.     Return of Confidential Information.** Employee covenants and agrees that he will not take from Company, for his own use or the use of any third party, any document, paper, computer-generated media, or other property of Company containing Confidential Information. Employee shall, upon termination of his employment or at any time that Company requests, deliver to Company any document, paper, computer-generated media or other property of Company (and all copies of same) in Employee's possession that contains Confidential Information.

**5.     Trade Names.** Employee covenants and agrees that he has no ownership or interest in any of the Company's trade names (collectively, "Trade Names") and covenants and agrees that he has no right to use the Trade Names without permission at any time.

**6.     Covenant Against Competition.** Employee acknowledges that his/her services to be rendered are of a special and unusual character which have a unique value to Company and that, because the damages suffered from Employee's breach of this covenant against competition would not be readily susceptible of measurement in an action of law, there is no adequate remedy at law. The Parties agree that a violation of the provisions of this paragraph shall cause an immediate and irreparable injury to Company. In view of the unique value to Company of the services of Employee and because of the Confidential Information to be obtained by or disclosed to Employee in connection with his employment, and as a material inducement for Company to employ Employee and to pay Employee compensation, Employee covenants and agrees that, during his employment and for a period of **two (2) years** after the termination or expiration of his employment for any reason (collectively, the "Restrictive Period"), Employee shall not, without first obtaining Company's express written agreement, as self-employed or employee or independent contractor of any professional association, corporation or other entity, or as a shareholder or a member of any corporation or other entity, or as director, officer, principal, agent, owner, employer, advisor, consultant, or in any individual or representative capacity whatsoever,

either for Employee's own benefit or for the benefit of any other person or entity, or otherwise, engage directly or indirectly in competition with Company in the following counties in the State of Florida: Broward, Palm Beach and Miami-Dade.  Additionally, such geographic area shall include the area having a radius of 50 (Fifty) miles around any office of Company established at the time or after the execution of this Agreement.  The entire geographic area described in this subparagraph is collectively defined as "Company's Market Area." The Restrictive Period shall be extended during any period Employee is in breach of this section.

       **7.**    **Covenant not to Solicit or Divert Work from Current and/or Prospective: Candidates, Clients, Referral Sources, or Customers.**  For purposes of this Section, current and/or prospective:  candidates, clients, referral sources, and/or customers of the Company, shall be individually and collectively referred to as "Prohibited Parties."

       Employee agrees that during the employment period and during the Restrictive Period, Employee shall: (1) not solicit (directly or indirectly) work from or provide services to any Prohibited Parties other than for the benefit of Company; (2) not solicit (directly or indirectly) any Prohibited Parties to cease doing business with Company; (3) not solicit (directly or indirectly) any Prohibited Parties to commence receiving services with a legal or natural person other than Company; (4) not enter (directly or indirectly) into any business or arrangement which has the effect of diminishing Company's business; (5) not solicit (directly or indirectly) from any Prohibited Parties to provide (directly or indirectly) services of a type or kind that the Employee knows or reasonably should know that Company has performed or would have the capability to perform, even if Company does not do the work in question on a regular basis; and (6) not solicit (directly or indirectly) any Prohibited Parties for any other business purposes that would disadvantage Company in any way.

       "Solicit," whether directly or indirectly, shall not be limited in its definition to mean only the initiation of contact.  Rather, "solicit" shall include, but not be limited to, the initiation of contact by Employee or independent contractor, as well as Employee's or independent contractor's acceptance of an invitation of contact from Prohibited Parties.

       It is the parties' intent that this covenant be construed as broadly as possible to protect and preserve Company's current and prospective candidate, client, referral source, and/or customer relationships during the Restrictive Period.  The parties agree that the Restrictive Period shall be extended by any length of time during which the Employee is in breach of the covenant.

       **8.**    **Covenant not to Solicit Employees.**  Employee agrees that during employment and during the Restrictive Period, Employee shall not, directly and/or indirectly, solicit or attempt to solicit or persuade Company's employees and/or independent contractors to terminate their employment or contractual relationship respectively with Company and/or to accept employment with another employer or enter into a partnership, contract, agreement, or other business relationship that competes in any way with Company.  The Employee acknowledges that this covenant is appropriate in view of the specialized training provided by Company to its employees, and the fact that the covenant is limited to solicitation of employees to terminate their employment. Both parties agree that the Restrictive Period shall be extended by any length of time during which the Employee is in breach of the covenant.

**9.     Covenant of Duty of Loyalty.** The Employee agrees that during the time that Employee is working for Company, the Employee owes Company a duty of loyalty, and that as part of this duty of loyalty, the Employee shall not engage in any form of business activity representing competition with Company, or plan any post-employment competitive business activity. Similarly, the Employee, while employed by Company, shall not appropriate for the Employee's own use any business opportunity for Company, or plan such appropriation, or otherwise engage in conduct amounting to a conflict of interest.

**10.     Obligation to Disclose This Agreement.** Employee agrees that he shall disclose the obligations contained in this Agreement to any third party that offers to employ him or engage him as an independent contractor in anticipation that his employment by Company will cease, and to any third party that in fact does employ him or engage him as an independent contractor after his employment by Company ceases.

**11.     Remedies.** The Employee agrees that the rights of Company provided by this Agreement are special, unique, and of extraordinary character and that Company will be without adequate remedy at law if the Employee violates any of those covenants. Accordingly, the Employee agrees that Company shall be entitled to injunctive relief to enforce such covenants.

In the event of a breach by Employee of the provisions of this Agreement, Company shall be entitled to recover from Employee any and all damages and costs suffered by Company resulting from Employee's breach, including but not limited to Company's attorney's fees and costs through and including all trial, appellate, and post-judgment proceedings. In addition to any action at law which Company may otherwise be entitled, Company shall also be entitled to exercise any and all rights in equity, including, without limitation, a temporary and/or permanent restraining order enjoining Employee from any and all violations of the terms and provisions of this Agreement. Employee understands that this covenant is an essential element of his employment relationship with Company and that, but for his agreement to comply with this covenant, Company would not have agreed to enter into or to continue the employment relationship (provided, however, that this Agreement is not intended to give Employee a right to employment).

**12.     Reasonableness of Restrictions; Independence of Covenants.** Employee has carefully read and considered the provisions of this Agreement, and having done so acknowledges and agrees that the restrictions set forth in this Agreement are fair and reasonable and are reasonably required and necessary for the protection of the legitimate business interests of Company. Each of the covenants set forth in this Agreement is independent of any other provisions in this Agreement; and each of the covenants set forth in this Agreement is independent of any other provision in any other agreement by, among, or affecting Company and Employee; and each of the covenants set forth in this Agreement is independent of the existence of any claim or cause of action by Employee against Company. The existence of any claim or cause of action of the Employee against Company, whether based on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of any covenant in this Agreement.

**13.     Reformation.** In the event that any part of the restrictions shall be held invalid, void, or unenforceable by a court of competent jurisdiction, the Parties acknowledge and agree

that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed invalid, void, or unenforceable and that, as so modified, the covenant, shall be as fully enforceable as if it had been set forth herein by the parties. It is the Parties' intent that any covenant held overbroad by any court be enforced to the maximum extent deemed reasonable by that court.

      **14.**     **Survival and Enforcement of Covenants.**  Employee acknowledges and agrees that the covenants and obligations contained in this Agreement shall survive the termination of the employment relationship, and are necessary to protect the Business and goodwill of Company and that a breach of these covenants will result in irreparable harm and continuing damage to Company. As a result, Employee agrees that in the event Employee breaches or threatens to breach such covenants, Company shall be entitled to specific performance, injunctive or other equitable relief, or any relief deemed appropriate by a court of competent jurisdiction, from Employee, or any future employer, employees, partners, or agents of Employee, to prevent the continuation of such harm, and any such relief shall be cumulative and in addition to whatever other remedies Company may have, including recovery of liquidated, incidental, special or consequential damages.

      Employee further acknowledges and agrees that any subsequent change in Employee's duties, salary, and compensation, status as employee and/or independent contractor, or title will not affect the validity or scope of this Agreement.

      **15.**     **Entire Agreement.**  This Agreement contains the entire agreement between Company and Employee on the matters covered herein and supersedes all prior agreements, discussions and understandings by or between Company and Employee. This Agreement may not be modified except by an instrument in writing duly executed by Company and Employee. The parties acknowledge that they have entered into an Employment Agreement, which agreement is separate and apart from this agreement and is not superseded hereby.

      **16.**     **Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit and detriment of the Parties hereto and their respective personal representatives and heirs. Company may assign this Agreement. This Agreement may be enforced by an assignee or successor of the Company. This Agreement may not be assigned by the Employee.

      **17.**     **Severability.**  If any provision of this Agreement shall be held to be invalid, illegal, or unenforceable, in whole or in part, and such provision cannot be reformed in accordance with this Agreement, then neither the validity of the parts of such provision nor the validity of any other provisions of this Agreement shall in any way be affected.

      **18.**     **Notices.**  All notices and other communications given under any provision of this Agreement shall be in writing and shall be delivered (a) in person; (b) mailed, postage prepaid, registered or certified, return receipt requested; or (c) delivered by commercial overnight carrier such as Federal Express. All such notices and communications shall be addressed to the receiver of such notice at the address set forth below, or to such other address as may have been specified in a written notice duly given to the sender as provided hereunder.

      As to Company:       Marketing Partner Services L.L.C.

6119 Lyons Road, Suite ___
Coconut Creek, Florida 33073

As to Employee: _____Kathryn Saoehno_____

_____

_____

Each such Notice shall be deemed delivered on the date delivered if by personal delivery; or on the date upon which the return receipt is signed, or delivery is refused, or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed, postage prepaid, registered or certified, return receipt requested or delivered by commercial overnight carrier such as Federal Express.

19.    **Waivers.**  The waiver by either Party of any right or remedy under the terms of this Agreement shall not be construed as a waiver of any other provision of this Agreement. Additionally, the waiver of any breach of a provision in this Agreement shall not be deemed a waiver of any prior or future breach of the same provision.

20.    **Attorneys' Fees and Costs.**  In any action, proceeding, or litigation relating to, connected with, or arising out of this Agreement, the prevailing party shall be entitled to reimbursement of its costs, including attorney's fees, incurred through all trial, appellate, and post-judgment proceedings, if any.

21.    **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to conflicts of laws principles.

22.    **Jurisdiction and Venue.**  Each party irrevocably submits to the exclusive personal jurisdiction of the state courts located in Palm Beach County, Florida, and exclusive venue in Broward County, Florida.  Each party agrees that the Circuit Court for the Fifteenth Judicial Circuit in and for Broward County shall be the exclusive jurisdiction and exclusive venue of any litigation or special proceeding to resolve any dispute or claim arising from, related to, or connected with this Agreement, including any claims based upon statute, common law or rule.  The parties waive any objection to such forum based upon venue or forum non conveniens grounds.

23.    **WAIVER OF JURY TRIAL.**

**EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY DISPUTE, LITIGATION, OR COURT ACTION (INCLUDING, BUT NOT LIMITED TO, ANY CLAIMS, CROSSCLAIMS, OR THIRD-PARTY CLAIMS) ARISING FROM, GROWING OUT OF, OR RELATED TO THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THIS WAIVER IS A SIGNIFICANT CONSIDERATION TO, AND A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT EITHER PARTY WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.**

24.     **Descriptive Headings.**  Descriptive headings contained herein are for convenience only and shall not control or affect provisions of this Agreement.

25.     **Intended Third-Party Beneficiaries.**  In Box Specialists L.L.C. and Site Impact L.L.C. (collectively, the "Third-Party Beneficiaries") are third-party beneficiaries of this Agreement.  All rights and remedies are intended for the benefit of the Third-Party Beneficiaries, and without any limitation on the Company's rights and remedies.

| COMPANY: | EMPLOYEE: |
|---|---|
| **MARKETING  PARTNER  SERVICES L.L.C.**<br>By (print name): Dan . Lansman<br>Title:                   President<br>Dated:              10-1-2017 | Print: Kathryn Suschino<br>Dated: 10/1/17 |