**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Civil Action No. 0:24-cv-61567-DIMITROULEAS/SNOW

MARKETING PARTNER SERVICES L.L.C.
and SITE IMPACT L.L.C.,

        Plaintiffs,

v.

KATHRYN SCIORTINO, an individual,
and DATASYS GROUP, INC.,

        Defendants.

_____/

**AMENDED COMPLAINT**

    Plaintiffs Marketing Partner Services L.L.C. ("MPS") and Site Impact L.L.C. ("Site Impact") (collectively "Plaintiffs") file this Amended Complaint and Application for Temporary Injunctive Relief against Defendants Kathryn Sciortino ("Sciortino") and Datasys Group, Inc. ("Datasys") (collectively "Defendants") and respectively states as follows:

**NATURE OF THE ACTION**

    1.    This is an action for breach of contract, tortious interference with a business relationship, trade secret misappropriation in violation of Florida's Uniform Trade Secrets Act (Fla. Stat. § 688.001 *et seq.*) and the Federal Trade Secret Act, unfair competition, and violations of Florida's Computer Abuse and Data Recovery Act ("CADRA") (Fla. Stat. § 668.801) .

**PARTIES, JURISDICTION AND VENUE**

    2.    Plaintiff Marketing Partner Services L.L.C. is a Florida limited liability company with its principal place of business located in Coral Springs, Florida.

3.      Plaintiff Site Impact L.L.C. is a Florida limited liability company with its principal place of business located in Coral Springs, Florida.

4.      Defendant Datasys Group, Inc. is a Florida company with its principal place of business located in Boca Raton, Florida.

5.      Upon information and belief, Defendant Kathryn Sciortino is a natural person domiciled in Palm Beach County.

6.      Defendant Kathryn Sciortino is currently employed by Defendant Datasys Group, Inc., with its principal place of business located in Boca Raton, Florida.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

8.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Defendants pursuant to § 48.193, Fla. Stat.

10.      Venue is proper in this District because a substantial part of the events or acts, omissions or other conduct giving rise to the claims in this Amended Complaint occurred in this judicial district.

## GENERAL ALLEGATIONS

### MPS and Site Impact

11.      Brandon Rosen is the founder and owner of both MPS and Site Impact. Rosen previously founded and owned BMI Ventures Inc. d/b/a BMI Elite ("BMI"), a company that was eventually re-branded in or around 2017 as Site Impact.

12.      BMI''s rebranding to Site Impact did not affect its business, products, services, market, client base, leadership, or function.  In other words, the business remained the same in all but name.

13.     As part of the 2017 rebranding from BMI to Site Impact, Rosen also created MPS to act as the employer of record for individuals working for Site Impact.

14.     MPS is the employer of record for those who work for Site Impact and handles payroll and employee benefits.

15.     Site Impact is the outward facing brand for which MPS employees work.

### Site Impact's Niche Business

16.     Site Impact is the leading white-label, multichannel digital marketing platform serving media companies, digital agencies, and their local advertiser customers. Site Impact works with clients to provide marketing solutions to help them target their ideal audiences. Site Impact specializes in multi-channel direct marketing services and delivers measurable results for its clients.

17.     Site Impact's premier offering is its Email Enhanced product. This product is comprised of a blend of various types of media, which may include e-mails, banners, buttons, text-links, clicks, sponsored emails, display ads, pop-ups, pop-unders, and similar online media. Site Impact's unique Email Enhanced product provides clients with specialized tools to implement successful multi-channel marketing campaigns. This specialized product helps clients maximize user engagement through a mixture of digital and media services.

18.     Site Impact utilizes real-time bidding platforms to purchase contextual ads for its clients to target the specific users within the client's market. The Email Enhanced product allows clients to use sponsored email ads and guarantees inbox placement.

19.     Site Impact's clients consist primarily of local media companies, small and midsized advertising agencies, and advertising resellers. This allows Site Impact to work with clients' customers (i.e., local car dealerships, businesses, etc.) to reach a broader client base.

**Sciortino's Role and Agreement**

20.      Sciortino has a long history working with Rosen for his digital marketing businesses.

21.      Sciortino began working for Rosen prior to the start of BMI until her abrupt resignation on July 22, 2024.

22.      Sciortino began her employment with BMI starting on or about on or about February 1, 2011, as a Business Development Manager. During her tenure with BMI, her responsibilities were to source, prospect, and close new accounts for BMI. Sciortino was also responsible for managing and growing the book of business.

23.      When BMI rebranded as Site Impact, Sciortino maintained the same position and job duties. Starting on October 1, 2017, Sciortino worked for Plaintiffs in the role of Business Development Manager. As Business Development Manager, Sciortino continued the same duties she had at BMI: sourcing, prospecting, and closing new accounts for Site Impact. Sciortino continued to manage and grow the same book of business.

24.      In or around June 2022, Sciortino accepted the new role of Key Account Manager. As Key Account Manager, Sciortino was responsible for client management, which included providing all services, maintaining client relationships, and communicating with clients regarding Site Impact's product offerings. Site Impact relies on its Key Account Managers to grow the company's book of business by maintaining and growing the current customer base.  Sciortino was responsible for maintaining consistent communication with Site Impact's clients to maximize the revenue from existing accounts. She was also responsible for onboarding new clients, training clients, setting up campaigns, and optimizing campaign results.

25.     Sciortino's offer letter explicitly states that the terms of her employment are explained in detail within the "Employment Agreement; the Non-Compete, Non-Solicitation, Confidentiality and Non-Disclosure Agreement, and the Employee Handbook." The offer letter explained that the job offer is contingent upon the execution of the offer letter, sales commission agreement and schedule, employment agreement, and non-compete, non-solicitation, confidentiality, and non-disclosure agreement. Sciortino signed and dated the offer letter on October 13, 2017.

26.     Sciortino received, signed, and dated the aforementioned Non-Compete, Non-Solicitation, Confidentiality and Non-Disclosure Agreement (the "Agreement") on October 1, 2017. (Exhibit A).

27.     The Agreement specifically states that Site Impact is the "Intended Third-Party Beneficiary." (Exhibit A, ¶ 25). Sciortino agreed that "[a]ll rights and remedies are intended for the benefits of [Site Impact L.L.C.] and without any limitation on the Company's rights and remedies." (Exhibit A, ¶ 25).

28.     The Agreement contains a Non-Disclosure of Confidential Information provision in which Sciortino agreed that she shall not, "at any time during Employee's employment or for ten (10) years after termination of employment, directly or indirectly, communicate, divulge or disclose, for any purpose whatsoever, or use for Employee's own benefit, or the benefit of any third party, any Confidential Information." The Agreement defines "Confidential Information" as, *inter alia*, "confidential information of a special and unique nature and value relating to such matters as Company's proprietary information with respect to the operation of the Company, its business, or the conduct of its marketing, advertising, research, and other proprietary procedures, all information and lists relating to actual, past, present and/or potential candidates, clients,

customers, and referral sources, including names, addresses, telephone numbers, e-mail addresses, or any other identifying information; all information and lists relating to vendors and suppliers; methods of operation, systems, procedures, manuals, and confidential reports; sales and marketing plans; service information; financial strategies; and any other proprietary and confidential information disclosed to, known by, or developed by Employee as a direct or indirect consequence of or through Employee's employment with Company." (Exhibit A, ¶ 3).

29.     Pursuant to the Agreement between MPS and Sciortino, the parties anticipated that Sciortino would receive Confidential Information and Trade Secrets from Site Impact. All Confidential Information from Site Impact is protected under the Agreement as Sciortino acknowledged that she would use all information she received in the course of her employment only under confidential conditions. (Exhibit A, ¶ 3).

30.     The Agreement also contains a non-compete provision of limited duration that precludes Sciortino from performing certain activities for a competitor within a limited territory:

> **Covenant Against Competition**. Employee acknowledges that his/her services to be rendered are of a special and unusual character which have a unique value to Company and that, because the damages suffered from Employee's breach of this covenant against competition would not be readily susceptible of measurement in an action of law, there is no adequate remedy at law. The Parties agree that a violation of the provisions of this paragraph shall cause an immediate and irreparable injury to Company. In view of the unique value to Company of the services of Employee and because of the Confidential Information to be obtained by or disclosed to Employee in connection with her employment, and as a material inducement for Company to employ Employee and to pay employee compensation, Employee covenants and agrees that, during his employment and for a period of two (2) years after the termination or expiration of his employment for any reason (collectively, the "Restrictive Period"), Employee shall not, without first obtaining the Company's express written agreement, as self-employed or employee or independent contract of any professional association, corporation, or other entity, or as a shareholder or a member of any corporation or other entity, or as director, officer, principal, agent, owner, employer, advisor, consultant, or in any individual or representative capacity whatsoever, either for Employee's own benefit or for the benefit of any other person or entity, or otherwise engage directly or indirectly in competition with Company in the following counties in the State of Florida:

Broward, Palm Beach and Miami-Dade. Additionally, such geographic area shall include the area having a radius of 50 (Fifty) miles around any office of Company established at the time or after the execution of this Agreement. The entire geographic area shall include the area having a radius of 50 (Fifty) miles around any office of Company established at the time or after execution of this Agreement. The entire geographic area described in this subparagraph is collectively defined as "Company's Market Area." The Restrictive Period shall be extended during any period Employee is in breach of this section.

(Exhibit A, ¶ 6).

31.     The Agreement also contains a Covenant not to Solicit or Divert Work from Current and/or Prospective Candidates, Clients, Referral Sources, or Customers ("Prohibited Parties") in which Sciortino agreed that:

> . . . during the employment period and during the Restrictive Period, Employee shall: (1) not solicit (directly or indirectly) work from or provide services to any Prohibited Parties other than for the benefit of the Company; (2) not solicit (directly or indirectly) any Prohibited Parties to cease doing business with Company; (3) not solicit (directly or indirectly) any Prohibited Parties to commence receiving services with a legal or natural person other than Company; (4) not enter (directly or indirectly) into any business or arrangement which as the effect of diminishing Company's business; (5) not solicit (directly or indirectly) from any Prohibited Parties to provide (directly or indirectly) services of a type or kind that the Employee knows or reasonably should know that Company has performed or would have the capability to perform, even if Company does not do the work in question on a regular basis; and (6) not solicit (directly or indirectly) any Prohibited Parties for any other business purposes that would disadvantage Company in any way.

> "Solicit," whether directly or indirectly, shall not be limited in its definition to mean only the initiation of contact. Rather, "solicit" shall include, but not be limited to, the initiation of contact by Employee . . ., as well as Employee's . . . acceptance of an invitation of contact from Prohibited Parties.

> It is the parties' intent that this covenant be construed as broadly as possible to protect and preserve Company's current and prospective candidate client, referral source, and/or customer relationships during the Restrictive Period. The parties agree that the Restrictive Period shall be extended by any length of time during which the Employee is in breach of the covenant.

(Exhibit A, ¶ 7).

32.     The Agreement also contains a Covenant of Duty of Loyalty in which Sciortino agreed not to "engage in any form of business activity representing competition with Company, or plan any post-employment competitive business activity." (Exhibit A, ¶ 9).

33.     Sciortino expressly agreed to return all Confidential Information and agreed that she "will not take from Company, for [her] own use or the use of any third party, any document, paper, computer-generated media, or other property of the Company containing Confidential Information." (Exhibit A, ¶ 4).

34.     Finally, the Agreement requires that Sciortino disclose her obligations to any future employers: "Employee agrees that he shall disclose the obligations contained in this Agreement to any third party that offers to employ him or engage him as an independent contractor in anticipation that his employment by Company will cease, and to any third party that in fact does employ him or engage him as an independent contractor after his employment by Company ceases." (Exhibit A, ¶ 10).

35.     During the course of Sciortino's employment, Sciortino had access to a great deal of confidential and trade secret information from Site Impact. In both of her roles, Sciortino had access to highly confidential client information.  Sciortino had intimate knowledge of each client's target market, marketing strategies, and contact information to maximize their email marketing campaigns.

36.     At the time of her resignation, Sciortino was responsible for working with some of Site Impact's top-tier accounts on a daily basis and worked directly with client leadership and stakeholders, strategizing with the clients on their independent needs and working with clients on ways to grow their relationships with Site Impact. Site Impact assigned Sciortino to specific clients

and was responsible for maintaining and growing those client accounts. She also solicited and serviced new clients using the tools and resources Site Impact provided to her.

37.     In addition to Email Enhanced, Sciortino also sold Site Impact's suite of other digital marketing solutions (i.e., Display, Facebook, and over-the-top ("OTT") media services).

38.     In her role, Sciortino had leadership resources at her disposal to assist with any client needs, including documents and case studies to provide her clients with the information they needed. At the time of her resignation, Sciortino was managing the entire partnership between the business and stakeholders within Site Impact's clients' organizations.

39.     Site Impact also provided Sciortino with access to its Order Management System ("OMS"), which is Site Impact's proprietary customer relationship management software. Through OMS and other systems, Sciortino had regular access to customer lists and contact information, customer financial information, customer pricing, and back-end customer settings.

40.     Site Impact takes reasonable measures to protect its competitively sensitive and confidential information, including but not limited to client data, marketing and sales strategies, and pricing information. This includes requiring all employees, including Sciortino, to sign confidentiality agreements. Such agreements are intended to protect Site Impact's business, including the competitively sensitive and confidential information that gives Site Impact an advantage over its direct competitors, such as Datasys.

41.     In addition to using restrictive covenants, Site Impact employs several security and control measures. Site Impact utilizes a multi-level security structure to ensure the protection of its Confidential Information and Trade Secrets. This includes requiring password-level security for all employees, restricting access to files and information, using multi-factor authentication and

firewalls, limiting logins from certain states and foreign countries, and investigating all security breaches and unauthorized file access.

42.     Additionally, specific client data and information are accessible by only those individuals who need to use such information in the course and scope of their job duties for Plaintiffs. Indeed, only the individuals assigned to a particular client and upper management have the ability to access that client's information.

43.     Site Impact also protects its OMS through the security measures above, as well as through passwords that must be regularly changed. The customer data within OMS is also protected, and certain access is permission-based. Nevertheless, Sciortino had full access during her employment to all of her client's data and contact information. Due to Sciortino's significant tenure with Site Impact and its predecessor, Sciortino has historical knowledge of clients that she gained throughout her 13 years with the company.

**Sciortino Breaches The Agreement and Unfairly Competes**

44.     On or about July 11 to July 19, 2024, Sciortino was out of the office on vacation, utilizing Paid Time Off ("PTO"), during which time she was completely relieved of her job duties.

45.     When she returned to work on July 22, 2024, at 9:00 a.m., she emailed notice of her immediate resignation to her manager and the Human Resources team. Despite working for Rosen's companies for 13 years, Sciortino did not provide any notice of her resignation.

46.     On July 23, 2024, the day after Sciortino's resignation, Plaintiffs learned that Sciortino had begun working for its direct competitor, Datasys.

47.     Datasys offers many of the same products and services as Site Impact and competes with Site Impact for the same client base.

48.     Datasys advertises itself as a "leading data, analytics and digital media solutions provide with several proprietary data sets, multiple marketing channels and a robust marketing cloud. [Datasys] can analyze, strategize, and execute virtually any customer acquisition or retention campaign."[1] One of Datasys' main product offerings, Email Plus, is substantially similar to Site Impact's Email Enhanced product. Further, there is significant overlap between Datasys and Site Impact's product offerings, as both companies offer digital marketing solutions such as Display, Facebook, and OTT.

49.     Datasys' office is located in Boca Raton, Florida, within 50 miles of Site Impact and squarely within the geographic area prohibited by Sciortino's non-competition agreement.

50.     On information and belief, Sciortino is working for Datasys in the same or substantially similar capacity in which she worked for Plaintiffs.

51.     On information and belief, Sciortino has disclosed and/or used Site Impact's confidential trade secret information, including customer lists, pricing, and sales information, for the benefit of Datasys.

52.     On information and belief, Sciortino is unable to provide the same services for Datasys as she had provided for Plaintiffs without necessarily using the information to which Sciortino had access when working for Plaintiffs.

53.     After Sciortino's termination, Plaintiffs discovered that while Sciortino was on vacation the week prior to her resignation, she improperly accessed and downloaded Site Impact's highly confidential trade secrets, including client activity and spending reports for at least eight clients. These trade secrets contain information regarding the products and services in which Site Impact's clients are interested, how often they have purchased products and services, the pricing

---

[1] Datasys, https://datasys.com/about-us (last visited July 31, 2024).

of products and services for each client, and the financial value of the client accounts. This information is highly confidential and provides Site Impact with a competitive advantage over its competitors.

54.     Site Impact has spent considerable time, effort, and expense tracking and compiling such information, which is not publicly available

55.     In the hands of a competitor, such confidential information would provide a competitive advantage that would undermine Site Impact in the narrow market in which it operates.

56.     The log information also reveals that when Sciortino was on vacation immediately prior to her departure from Plaintiffs' employ, she engaged in additional suspicious activity including, but not limited to: (i) engaging in a pattern of downloading reports from Plaintiffs' Order Management System containing client and order information, saving such reports locally on her laptop and not on Site Impact's approved file systems; (ii) accessing other services not approved by Plaintiffs; and (iii) then deleting the reports she had downloaded locally on her laptop.

57.     While Sciortino was on vacation, she accessed a contact and customer management tool called CircleBack. On or about July 18, 2024, Sciortino used her Site Impact laptop computer to work with both CircleBack and Site Impact's Order Management System from approximately 9:28 AM until approximately 3:10 PM.  On the following day, Sciortino used her Site Impact laptop computer to work with both CircleBack and Site Impact's Order Management System from approximately 11:50 AM until approximately 2:46 PM.

58.     Sciortino's team does not use CircleBack, her job duties did not require her to use CircleBack, and there is no legitimate business reason why Sciortino should have been using an unapproved service such as CircleBack.  Sciortino did not receive permission to use CircleBack or input Site Impact's information into this program.

59.     Plaintiffs do not have any accounts with CircleBack and have not licensed any software from CircleBack.

60.     On July 22, 2024, a few hours prior to Sciortino's abrupt resignation without notice, she again utilized CircleBack and Site Impact's Order Management System on her Site Impact computer (from approximately 7:29 AM until approximately 9:04 AM).

61.     Upon information and belief, Sciortino copied Plaintiffs confidential proprietary information and trade secrets into CircleBack.

62.     Upon information and belief, Sciortino copied Plaintiffs confidentiality proprietary information and trade secrets into CircleBack so that she could access such information after her resignation from employment to improperly compete with Plaintiffs in her new position with Datasys.

63.     Upon information and belief, Sciortino took Plaintiffs' confidential proprietary information and trade secrets, whether through copying such information into CircleBack or through other means, with the support of and/or at the direction of Datasys.

64.     Upon information and belief, Datasys was able to access and utilized Plaintiffs' confidential and trade secrets information as a result of Sciortino's wrongful taking of such information from Plaintiffs.

65.     After Sciortino's termination, Site Impact's customer support team received an email from a client that Sciortino had managed prior to her resignation.  In the e-mail, client advised that it had received a solicitation from Sciortino indicating, among other things, that she had moved to a different company (Datasys).

66.     Upon information and belief, Sciortino has been actively soliciting Site Impact's clients in her new position at Datasys, in an effort to directly compete against Site Impact, in breach of the Agreement.

**Plaintiffs Demand Defendants Cease & Desist**

67.     Following the discovery of improper conduct by Defendants, Plaintiffs sent both Sciortino and Datasys an immediate cease and desist letter dated July 23, 2024.

68.     In the cease and desist letter to Sciortino, Plaintiffs reminded Sciortino of her contractual obligations to Plaintiffs and demanded that she cease any and all activity in violation of the Agreement.

69.     In the cease and desist letter to Datasys, Plaintiffs notified Datasys of Sciortino's ongoing post-employment obligations, including the obligation not to compete against Plaintiffs, solicit Site Impact's clients or employees, or disclose Plaintiff's confidential information. Plaintiffs attached a copy of the Agreement to this letter. Plaintiffs also provided Datasys with a copy of Plaintiffs' cease and desist letter to Sciortino.

70.     Counsel for Datasys contacted the undersigned counsel acknowledging receipt of the cease and desist letter. As such, Datasys is aware of Sciortino's duties and role for Plaintiffs, as well as the restrictive covenants in the Agreement.

71.     Datasys confirmed it hired Sciortino and that Sciortino was working in a sales capacity. As such, it is clear that Sciortino is working for a Competing Business and performing the same and/or similar activities at Datasys that she performed for Plaintiffs, in the restricted territory, in direct violation of the non-competition provisions of the Agreement.

72.     Despite this notification, Defendants continued their unlawful conduct even *after* their receipt of the cease and desist letters. Defendants have caused and will continue to cause

continuing and irreparable injury, which monetary damages cannot cure. Injunctive relief is imperative to preserve the status quo pending litigation between the parties on the merits.

73.     Plaintiffs have retained the undersigned counsel to bring this suit and have agreed to pay them reasonable attorneys' fees and costs.

74.     All conditions precedent to bringing this action have occurred, been met, excused, or waived.

**COUNT I**
**BREACH OF CONTRACT—NON-COMPETITION**
**(Against Defendant Sciortino)**

75.     Plaintiffs incorporate by reference paragraphs 1-74 of the Amended Complaint as if the same were set forth in full herein.

76.     The Agreement is a valid and enforceable contract that is supported by adequate consideration.

77.     Sciortino executed the Agreement on October 1, 2017, in exchange for compensation and other benefits she received from Plaintiffs.

78.     Plaintiffs fully performed their obligations under the Agreement, or were otherwise excused from such performance by Sciortino's actions and material breaches.

79.     Sciortino materially breached the Agreement by working for Plaintiffs' direct competitor, Datasys, in violation of Paragraph 6 of the Agreement.

80.     The noncompete provision in the Agreement is reasonable in time, area, and line of business and reasonably necessary to protect Plaintiffs' legitimate business interests in their valuable confidential business and client information, trade secrets, substantial relationships with prospective and existing clients, specialized training, and customer goodwill.

81.     As a direct and proximate result of Sciortino's material breach of the Agreement, Plaintiffs have suffered damages and continue to suffer damages by virtue of Sciortino's ongoing wrongful conduct.

82.     Sciortino's material breach of the Agreement has caused, and will continue to cause, irreparable harm to Plaintiffs if not temporarily and permanently enjoined.

83.     The public interest will be served by enjoining Sciortino from continuing such conduct, and the entry of injunctive relief will not negatively impact the health, safety, or welfare of the public at large.

84.     Plaintiffs have no adequate remedy at law.

### COUNT II
### BREACH OF CONTRACT—NON SOLICITATION
### (Against Defendant Sciortino)

85.     Plaintiffs incorporate by reference paragraphs 1-74 of the Amended Complaint as if the same were set forth in full herein.

86.     The Agreement is a valid and enforceable contract that is supported by adequate consideration.

87.     Sciortino executed the Agreement on October 1, 2017, in exchange for compensation and other benefits she received from Plaintiffs.

88.     Plaintiffs fully performed their obligations under the Agreement, or were otherwise excused from such performance by Sciortino's actions and material breaches.

89.     Sciortino materially breached the Agreement by soliciting at last one or more clients with whom she worked directly during her employment and work for Plaintiffs in violation of the non-solicit provision of the Agreement.

90.     The non-solicit provision in the Agreement is reasonable in time, area, and line of business, and is reasonably necessary to protect Plaintiffs' legitimate business interests in their valuable confidential business and client information, trade secrets, substantial relationships with prospective and existing clients, specialized training, and customer goodwill.

91.     As a direct and proximate result of Sciortino's material breach of the Agreement, Plaintiffs have suffered damages and continue to suffer damages by virtue of Sciortino's ongoing wrongful conduct.

92.     Sciortino's material breach of the Agreement has caused, and will continue to cause, irreparable harm to Plaintiffs if not temporarily and permanently enjoined.

93.     The public interest will be served by enjoining Sciortino from continuing such conduct, and the entry of injunctive relief will not negatively impact the health, safety, or welfare of the public at large.

94.     Plaintiffs have no adequate remedy at law.

### COUNT III
### BREACH OF CONTRACT—CONFIDENTIALITY
### (Against Defendant Sciortino)

95.     Plaintiffs incorporate by reference paragraphs 1-74 of the Amended Complaint as if the same were set forth in full herein.

96.     The Agreement is a valid and enforceable contract that is supported by adequate consideration.

97.     Sciortino executed the Agreement on October 1, 2017, in exchange for compensation and other benefits she received from Plaintiffs.

98.     Plaintiffs fully performed their obligations under the Agreement, or were otherwise excused from such performance by Sciortino's actions and material breaches.

99.     Sciortino materially breached the Agreement by using and/or disclosing Plaintiffs' confidential information for the benefit of a third party in violation of the confidentiality provision in the Agreement.

100.     The confidentiality provision in the Agreement is reasonably necessary to protect Plaintiffs' legitimate business interests in their valuable confidential business and client information, trade secrets, substantial relationships with prospective and existing clients, specialized training, and customer goodwill.

101.     As a direct and proximate result of Sciortino's material breach of the Agreement, Plaintiffs have suffered damages and continue to suffer damages by virtue of Sciortino's ongoing wrongful conduct.

102.     Sciortino's material breach of the Agreement has caused, and will continue to cause, irreparable harm to Plaintiffs if not temporarily and permanently enjoined.

103.     The public interest will be served by enjoining Sciortino from continuing such conduct, and the entry of injunctive relief will not negatively impact the health, safety, or welfare of the public at large.

104.     Plaintiffs have no adequate remedy at law.

**COUNT IV**
**MISAPPROPRIATION AND MISUSE OF TRADE SECRETS IN VIOLATION OF THE**
**FLORIDA UNIFORM TRADE SECRETS ACT**
**(Against All Defendants)**

105.     Plaintiffs incorporate by reference paragraphs 1-74 of the Amended Complaint as if the same were set forth in full herein.

106.     Site Impact's customer list, customer information, and sales data constitute protectable trade secrets pursuant to Fla. Stat. § 688.002 in that they derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable

through proper means by, another person who could obtain economic value from the disclosure or use of the information.

107.    Site Impact has spent significant time and money developing such Confidential Information and Trade Secrets.

108.    Site Impact has made reasonable effort under the circumstances to keep customer lists, customer information, and sales data confidential, including, but not limited to, requiring its employees to sign agreements with non-disclosure provisions, restricting access to confidential and trade secret information, controlling access with two-factor authentication, and requiring that employees use passwords in order to further restrict access to such information.

109.    Plaintiffs' Confidential Information and Trade Secrets could not be compiled or created by Site Impact's competitors, if at all, without a significant investment of time, effort, and money.

110.    The use and/or disclosure of Plaintiffs' Confidential Information and Trade Secrets would provide Plaintiffs' competitors with an unfair economic advantage.

111.    In the course of her employment with and work for Plaintiffs, Plaintiffs afforded Sciortino access to and use of Site Impact's Confidential Information and Trade Secrets.

112.    Sciortino had a duty to maintain the secrecy of Plaintiffs' Confidential Information and Trade Secrets.

113.    On information and belief, Sciortino misappropriated Plaintiffs' trade secrets by *inter alia* using them for the benefit of her new employer Datasys, and/or improperly disclosing Site Impact's client list, client information, and sales data to Datasys, while under a duty to maintain the secrecy of such information, and to refrain from using such information for the benefit of anyone other than Plaintiffs.

114. Sciortino's aforementioned acts of misappropriation were accomplished through improper means and without the express or implied consent of Plaintiffs.

115. Datasys obtained Plaintiffs' Confidential Information and Trade Secrets by unlawful and improper means.

116. The disclosure and unauthorized use of Site Impact's Confidential Information and Trade Secrets undermines Site Impact's competitive position in the industry.

117. On information and belief, Defendants have used, disclosed, or relied upon Site Impact's Confidential Information and Trade Secrets in order to harm Plaintiffs or to benefit Site Impact's competitor Datasys.

118. Defendants' conduct is knowing, willful, intentional, and malicious, and taken with reckless disregard for the rights of Plaintiffs.

119. As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm.

**COUNT V**
**MISAPPROPRIATION AND MISUSE OF TRADE SECRETS IN VIOLATION OF THE**
**DEFEND TRADE SECRETS ACT 18 U.S.C. § 1839**
**(Against All Defendants)**

120. Plaintiffs incorporate by reference paragraphs 1-74 of the Amended Complaint as if the same were set forth in full herein.

121. Plaintiffs own valuable Confidential Information and Trade Secrets within the meaning of the Defend Trade Secrets Act 18 U.S.C. § 1839(4). Site Impact owns its proprietary OMS and all the data therein, which Sciortino accessed for non-work purposes while she was on leave from work using PTO.

122. Sciortino improperly accessed and downloaded Site Impact's highly confidential trade secrets, including client activity and spending reports for Site Impact's clients. These trade

secrets provide insight into the products and services Site Impact's clients are interested in, how often they have purchased those products and services, and how much money they have spent on such products and services. These trade secrets are valuable to Site Impact and its competitors because they assist in making targeted sales to clients based on offerings they have already shown an interest in and based on how much money they've historically spent.

123.    Site Impact has spent considerable time, effort, and expense tracking and compiling such information, which is not publicly available. Additionally, Site Impact has spent significant effort protecting these trade secrets via its IT Department and security measures.

124.    The trade secrets misappropriated by Defendants have significant economic value and provide Site Impact a competitive advantage in its narrow market. Finally, the misappropriated trade secrets are related to products and services used in and intended for use in interstate commerce.

125.    Defendants willfully and maliciously misappropriated Site Impact's trade secrets and confidential information.

126.    As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm.

**COUNT VI**
**COMMON LAW UNFAIR COMPETITION**
**(Against All Defendants)**

127.    Plaintiffs incorporate by reference paragraphs 1-74 of the Amended Complaint as if the same were set forth in full herein.

128.    Defendants' actions complained of herein constitute unfair competition in violation of Florida common law.

129.     Defendants developed and carried out a plan to solicit Site Impact's clients using Site Impact's Confidential Information and Trade Secrets improperly obtained by Sciortino during her employment with MPS and while working for Site Impact.

130.     Upon information and belief, Datasys induced Sciortino to directly compete with Site Impact and solicit Site Impact's clients, in violation of Sciortino's Agreement. (Exhibit A at ¶¶ 3, 6-7).

131.     Upon information and belief, Defendants are trading on Plaintiffs' goodwill to unfairly and improperly compete with Plaintiffs.

132.     Defendants' actions complained of herein constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of a trade or business, and therefore constitute unfair competition under the common law of the state of Florida.

133.     Defendants' unfair competition was and is willful and/or intentional.

134.     Defendants' unfair and unlawful conduct, has caused and, if not enjoined, will continue to irreparable harm and damage to Plaintiffs.

### COUNT VII
### TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Defendant Datasys)

135.     Plaintiffs incorporate by reference paragraphs 1-74 of the Amended Complaint as if the same were set forth in full herein.

136.     The Agreement between Sciortino and MPS is a valid and binding contract.

137.     Site Impact is explicitly listed as a third-party beneficiary of the Agreement and all rights and remedies are explicitly intended for the benefit of Site Impact, without any limitation on MPS's rights and remedies.

138.    The Agreement between Sciortino and MPS contains restrictive covenants that prevent Sciortino from working for third-party beneficiary Site Impact's competitor, either directly or indirectly.

139.    Datasys is and was aware of Sciortino's restrictive covenant obligations, which precluded Sciortino from working for Datasys, a direct competitor of Site Impact, for 2 years following the termination of Sciortino's employment.

140.    Datasys was on notice of Sciortino's restrictive covenants in the Agreement no later than July 23, 2024, when the undersigned counsel sent a letter to Datasys informing Datasys of Sciortino's restrictive covenants and providing a copy of the Agreement, to which counsel for Datasys responded the morning of July 24, 2024.

141.    Counsel for Plaintiffs also informed Datasys that Sciortino had been soliciting Site Impact's clients in direct violation of the Agreement.

142.    Despite knowledge of Sciortino's restrictive covenant obligations in the Agreement, Datasys continues to employ Sciortino, thereby inducing Sciortino to breach her obligations under the Agreement, in order to cause her to perform the same and/or substantially similar roles to that which she performed for Site Impact.

143.    Sciortino breached the Agreement by, *inter alia*, accepting employment with Datasys to perform the same and/or substantially similar job that she performed for Site Impact.

144.    Datasys' actions were and are intentional and unjustified.

145.    As a result of Datasys' tortious interference with the Agreement, Plaintiffs have suffered damages in an amount to be determined at trial.

146.    Additionally, Datasys' tortious interference has caused and will continue to cause irreparable injury to Plaintiffs for which no adequate remedy exists at law.

## COUNT VIII
## VIOLATION OF THE COMPUTER ABUSE AND DATA RECOVERY ACT
## Fla. Stat. § 668.801
## (Against all Defendants)

147.    Plaintiffs incorporate by reference paragraphs 1-74 of the Amended Complaint as if the same were set forth in full herein.

148.    Plaintiffs operate one or more "protected computers" as that term is defined in §688.802(6), Fla.Stat., as such computers are used in connection with the operation of Plaintiffs' business, the computers store information used in connection with Plaintiffs' business, and the stored information is only accessible to employees using a password or other security code or measure.

149.    Sciortino was assigned one or more passwords that allowed her to access various information stored on Plaintiffs' "protected computers."

150.    At all relevant times, Plaintiffs had policies and procedures in place that limited restricted the permitted use of information stored on its "protected computers" to purposes for the Plaintiffs' benefit.

151.    Sciortino unlawfully accessed and obtained Plaintiffs' proprietary and confidential information from its "protected computers," and then, upon information and belief, uploaded that information to one or more services that would allow Sciortino to continue accessing information obtained from Plaintiffs' "protected computers" following her separation from Plaintiffs' employ. Based upon log files that Plaintiffs have examined, it appears that Sciortino generated reports from Plaintiffs' "protected computers," and then uploaded information from those reports to a service called CircleBack.  Once Sciortino uploaded such information to CircleBack, she deleted the reports that she generated from Plaintiffs' "protected computers."  Moreover, the logs reflect that Sciortino was generating such reports, accessing CircleBack, and then deleting the reports, when

she was supposed to be on vacation less than a week before she abruptly, and without advanced notice, terminated her employment with Plaintiffs and then commenced employment with Datasys.

152.    Upon information and belief, it appears that almost immediately upon Sciortino's arrival at Datasys, she started to utilize information taken from Plaintiffs' "protected computers," including making contact with one of Plaintiffs' customers.

153.    Upon information and belief, Sciortino obtained and used information from Plaintiffs' "protected computers" at Datasys' instruction and/or with Datasys' support.

154.    As a proximate result of Sciortino's wrongful actions obtaining information from Plaintiffs' "protected computers," Sciortino has caused harm to Plaintiffs in an amount to be determined at trial.

155.    Pursuant to CADRA, Plaintiffs are entitled to recover actual damages, lost profits and economic damages, Defendants' profits not included in the computation of actual damages, injunctive relief and other equitable relief to recover the misappropriated information and to prevent a future violation of CADRA.

156.    Defendants actions have caused and continue to cause Plaintiffs irreparable harm.

157.    As a result of Defendants' CADRA violations, Plaintiffs are also entitled to recover their attorneys' fees and cost pursuant to Florida Statute § 668.804(2).

## **PRAYER FOR RELIEF, INCLUDING INJUNCTIVE RELIEF**

**WHEREFORE,** Plaintiffs Marketing Partner Services, L.L.C. and Site Impact L.L.C. respectfully request this Court enter an order as follows:

a.      granting temporary and permanent injunctive relief against Sciortino, enjoining her from working for a competing business of MPS or Site Impact for a period of 2 years, including but not limited to Datasys and any of its affiliates, parent companies, or other related entities;

b.       granting temporary and permanent injunctive relief against Sciortino, enjoining her from soliciting MPS's or Site Impact's clients, customers, prospective clients, or prospective customers in accordance with the Agreement for a period of 2 years;

c.       granting temporary and permanent injunctive relief against Datasys from further violation of and interference with the Agreement, including but not limited to the restrictive covenants within;

d.       granting temporary and permanent injunctive relief against Sciortino from further violation of the Agreement and enjoining Sciortino from any use or disclosure of MPS's or Site Impact's confidential information and trade secrets;

e.       granting temporary and permanent injunctive relief restraining Sciortino from unfairly competing with MPS or Site Impact by violating the Agreement;

f.       granting temporary and permanent injunctive relief prohibiting Defendants from misappropriating, disclosing, relying upon, or making available to any person or entity any of Site Impact's or MPS's Confidential Information and Trade Secrets.

g.       for an award of damages against Defendants in an amount to be determined by the trier of fact, together with pre- and post-judgment interest thereon at the maximum legal rate;

h.       requiring Defendants to immediately return all Confidential Information and Trade Secrets belonging to MPS and/or Site Impact and verify by affidavit the return of all Confidential Information and Trade Secrets;

i.       requiring Defendants to permit a third-party forensic vendor access to Sciortino's and Datary's' devices, electronic accounts, and systems to ensure that any and all of Site Impact's and/or MPS's Confidential Information and Trade Secrets are located and removed;

j.      for an award of punitive damages, liquidated damages, exemplary damages, and/or

penalties as provided for by applicable law;

k.      for an award of attorneys' fees and costs; and

l.      for any award of such other relief as the Court may deem just or appropriate.

Date: August 30, 2024                          Respectfully submitted,

By:   */s/ Arielle S. Eisenberg*
Arielle S. Eisenberg, Esq.
Fla. Bar. No. 0111467
aeisenberg@cozen.com
Samuel A. Lewis, Esq.
Fla. Bar. No. 55360
slewis@cozen.com
COZEN O'CONNOR
Attorney for Defendant
200 South Biscayne Boulevard
Suite 3000
Miami, FL 33131
Telephone:    786.871.3953
Facsimile:     786.220.0472

*Counsel for Plaintiffs*